UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 22-cv-23276-BLOOM/Otazo-Reyes**

SANDRA WALKER,
        Plaintiff,

v.

PHH MORTGAGE CORPORATION,
        Defendant.
_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant PHH Mortgage Corporation's ("Defendant") Motion for Summary Judgment, ECF No. [27] ("Motion"). Plaintiff Sandra Walker ("Plaintiff") filed a Response in Opposition, ECF No. [35] ("Response"), to which Defendant filed a Reply, ECF No. [37] ("Reply"). The Court has reviewed the Motion, all opposing and supporting submissions,[1] the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is granted in part and denied in part.

### I.   BACKGROUND

On October 10, 2021, Plaintiff initiated this action against Defendant, asserting three violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(k) ("RESPA"), and its implementing regulations under 12 C.F.R. § 1024 ("Regulation X"). *See* ECF No. [1]. On November 16, 2022, Plaintiff thereafter filed her Amended Complaint, ECF No. [11], alleging that Defendant violated RESPA and Regulation X by (1) failing to provide written notice of receipt of

---

[1] Defendant filed a Statement of Material Facts, ECF No. [28] ("SMF"), with its Motion for Summary Judgment. Plaintiff filed a Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment and a Statement of Additional Material Facts ("SAMF"), ECF No. [36], with its Response to Defendant's Motion. Defendant then filed a Reply to Plaintiff's SAMF ("RSAMF"). ECF No. [38].

Plaintiff's additional document submission within five business days (Count I); (2) failing to provide written notice of receipt of Plaintiff's facially complete Loss Mitigation Application within thirty days, (Count II); and (3) initiating a foreclosure action against Plaintiff's residential property despite receiving the Loss Mitigation Application and without informing Plaintiff whether she was eligible for any loss mitigation options (Count III).

On June 6, 2023, Defendant filed the instant Motion seeking summary judgment. Defendant contends that it is entitled to summary judgment on all of Plaintiff's RESPA claims because the undisputed material facts establish that (1) Defendant complied with Regulation X's notice requirements with respect to Plaintiff's Loss Mitigation Application; (2) Plaintiff's Loss Mitigation Application was incomplete, thereby absolving Defendant of additional notice obligations under Regulation X; (3) Defendant did not violate Regulation X's limited foreclosure prohibition because it is inapplicable for several reasons; (4) Plaintiff fails to show that she is entitled to statutory or actual damages; and (5) Plaintiff's RESPA claims are otherwise barred under the duplicative request exception.

Plaintiff responds that evidence establishes that (1) Defendant failed to comply with Regulation X's notice requirements regarding Plaintiff's Loss Mitigation Application; (2) Plaintiff's Loss Mitigation Application was either complete or facially complete, and therefore Defendant violated Regulation X's additional notice requirements; (3) Defendant violated Regulation X by initiating a foreclosure action against Plaintiff despite Plaintiff's submission of a facially complete loss mitigation application, violating RESPA's limited foreclosure provision; (4) the duplicative request exception is inapplicable; and (5) Plaintiff is entitled to statutory or actual damages.

Defendant replies that the undisputed evidence shows (1) Defendant did not violate

Regulation X's notice provisions with respect to Plaintiff's Loss Mitigation Application or June 8, 2022 submission of additional documents; (2) Plaintiff's Loss Mitigation Application was never rendered facially complete; (3) Plaintiff's claims are barred by the duplicative request exception; (4) Regulation X's foreclosure prohibitions are inapplicable because Plaintiff failed to perform under a prior loss mitigation option; and (5) Plaintiff is entitled to either statutory or actual damages.

## II.  MATERIAL FACTS

Based on the Parties' briefing and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### A.  The Loan

On about November 8, 2006, Janie Marshall ("Borrower") entered into a promissory note with an original principal balance of $310,000.00 ("Note"). The Note was secured by a Mortgage upon the property located at 17032 NW 49 Court, Miami Gardens, Florida 33055 that is recorded Book 25150, Page 2163 of the Public Records of Miami-Dade County, Florida ("Mortgage"). SMF ¶ 1; SAMF ¶ 1. On March 1, 2016, the Note and Mortgage were modified by a Loan Modification Agreement ("Loan Modification") (together the Note, Mortgage, and Loan Modification are the "Loan") to resolve the foreclosure proceedings, *Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Asset Trust 2007-1 v. Janie M. Marshall*, Case Number 2014-025178 (Miami-Dade County). SMF ¶ 2; SAMF ¶ 2. On June 1, 2019, Ocwen, the loan servicer, merged with Defendant, and the surviving entity was named PHH Mortgage Corporation. SMF ¶ 3; SAMF ¶ 3.

### B.  Plaintiff Acquires Title to the Property

On June 14, 2020, the Borrower died intestate and was survived by her descendants, Reginald Walker and Plaintiff, Borrower's daughter. SMF ¶ 4; SAMF ¶ 4. Upon the death of the

Borrower, title to the Property passed to Reginald Walker and Plaintiff. SMF ¶ 5; SAMF ¶ 5. On September 27, 2021, Reginald Walker executed and delivered a Quit Claim Deed transferring his interest in the Property to Plaintiff. SMF ¶ 6; SAMF ¶ 6.

### C. The Loan Enters a State of Default

Upon obtaining sole title to the Property, the Plaintiff did not assume the Loan. SMF ¶ 7; SAMF ¶ 7. The Loan entered a state of default on October 1, 2021. SMF ¶ 8; ECF No. [27-1] ¶ 11 ("Defendant's Affidavit"). It is disputed whether Defendant's Affidavit is admissible evidence to show that the Loan defaulted on October 1, 2021. Defendant's Affidavit ¶ 11; SAMF ¶ 8; RSAMF ¶ 8. On November 18, 2021, Defendant sent a notice of default to Plaintiff's late mother, the Borrower. ECF No. [27-1] at 88-91; Defendant's Affidavit ¶ 9. It is disputed whether Defendant mailed this letter to Plaintiff. SMAF ¶ 9; RSAMF ¶ 9. The November 18, 2021 letter provided that a cure payment in the amount of $1,976.11 was required within thirty days to cure the default and failure to cure the default may result in the commencement of foreclosure proceedings against the Property. ECF No. [27-1] at 88-91.[2] The parties dispute whether these facts are material to the present dispute. SAMF ¶ 9; RSAMF ¶ 9.

### D. The Parties' February and March 2022 Communications

On February 9, 2022, Plaintiff called Defendant and discuss her mother's passing and the status of the Loan with Defendant's employee ("the February 9 Call"). ECF No. [35-1] ¶ 13 ("Plaintiff's Affidavit"). Whether the February 9 Call constitutes an oral loss mitigation application is disputed, as is whether Plaintiff participated in a telephonic financial interview during this call. Plaintiff's Affidavit ¶ 13; ECF No. [27-1] at 93; SAMF ¶ 10; RSAMF ¶ 10.

It is disputed whether Defendant sent Plaintiff a letter on February 11, 2022,

---

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

acknowledging receipt of the disputed Loss Mitigation Application from the February 9 Call. ECF No. [27-1] 95-98; Defendant's Affidavit ¶ 14; SAMF ¶ 11; RSAMF ¶ 11. It is also disputed whether Defendant sent Plaintiff a second letter on February 14, 2022, stating that additional information was required to complete the disputed February 9, 2022 Loss Mitigation Application. ECF No. [27-1] at 100-07; Defendant's Affidavit ¶ 15; SAMF ¶ 12. Defendant did not receive a response to its February 11, 2022 or February 14, 2022 letters from Plaintiff. Defendant's Affidavit ¶ 17; SAMF ¶ 13. It is disputed whether Defendant sent a letter to Plaintiff on March 18, 2022, advising Plaintiff that the disputed Loss Mitigation Application remained incomplete, and that Defendant was discontinuing its review of the application. ECF No. [27-1] at 114-18; SAMF ¶ 14.

### E. Plaintiff's Loss Mitigation Application

On May 25, 2022, Plaintiff submitted a loss mitigation application to Defendant. ECF No. [27-1] at 120-67. It is disputed whether this application constitutes Plaintiff's first or second loss mitigation application. Defendant's Affidavit ¶ 18; SMF ¶ 14. Defendant sent Plaintiff a letter on May 31, 2022, acknowledging receipt of Plaintiff's Loss Mitigation Application. ECF No. [27-1] at 170-72. Defendant also sent Plaintiff a second letter on May 31, 2022, indicating that additional information was required to complete the second Loss Mitigation Application, listing the missing information, and requiring that the missing information be supplied to Defendant by June 30, 2022. ECF No. [27-1] at 174-77. On June 8, 2022, Plaintiff submitted additional documents to Defendant in response to Defendant's May 31, 2022 letter. ECF No. [27-1] at 179-89; Defendant's Affidavit ¶ 21. The extent to which those documents were previously submitted with Plaintiff's Loss Mitigation Application on May 25, 2022 is disputed, as is whether the submission of these documents rendered Plaintiff's Loss Mitigation Application complete or facially incomplete.[3]

---

[3] Whether the additional documents were sent via fax, email, or both is also disputed. *Id.*

SMF ¶ 17; SAMF ¶ 17. On June 8, 2022, Defendant sent an email acknowledging receipt of Plaintiff's email. ECF No. [27-1] at 189.

### F.  The Foreclosure Action

On June 23, 2022, Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Assets, commenced foreclosure proceedings against Plaintiff in the Circuit Court of Miami-Dade County, Florida, Case No. 2022-011750-CA-01 ("Foreclosure Action"). Defendant's Affidavit ¶ 23; SAMF ¶ 19. Defendant subsequently sent a letter to the Property on July 5, 2022 informing Plaintiff that her Loss Mitigation Application remained incomplete, and that Defendant was discontinuing its loss mitigation review due to insufficient information.[4] ECF No. [27-1] at 191-93. On July 8, 2022, a summons issued in the Foreclosure Action for Plaintiff and service was effectuated on July 16, 2022.[5] ECF No. [27-1] at 195-201.

### III.  LEGAL STANDARD

### A.  Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*

---

[4] The parties agree that Defendant did not advise Plaintiff that it deemed Plaintiff's Loss Mitigation Application incomplete until July 5, 2022, after the Foreclosure Action was filed. SAMF ¶ 28; RSAMF ¶ 28.

[5] Whether Defendant has a pattern and practice of violating Regulation X and RESPA is also disputed. SMF ¶ 22; SAMF ¶ 22; RSAMF ¶ 22.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990) (citation omitted).

## IV.   DISCUSSION

Defendant seeks summary judgment on each count of Plaintiff's Amended Complaint. The Court begins its analysis with Section 1024.41(i) of Regulation X, as Defendant contends that this provision bars all of Plaintiff's RESPA claims.

### A.   The Duplicative Request Exception

Section 1024.41(i) of Regulation X provides that loan servicers must:

> [C]omply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application.

12 C.F.R. § 1024.41(i).

Section 1024.41(i) "merely requires that the mortgagee considers one application for loan modification, not duplicative requests." *Miller v. Bank of New York Mellon, Tr. to JPMorgan Chase Bank, Nat'l Ass'n*, No. 21-1126, 2021 WL 5702331 at *3 (6th Cir. 2021). The parties dispute whether the February 9 Call constitutes an oral loss mitigation application. As such, the Court first determines whether the February 9 Call meets the definition of a loss mitigation application under Regulation X.

### i.    Loss Mitigation Application under Section 1024.31

"Section 1024.31 of Regulation X defines [a] '[l]oss mitigation application' as 'an oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation for a loss mitigation option.'" *Yeh Ho v. Wells Fargo Bank, N.A.*, 739 Fed. Appx. 525, 529 (11th Cir. 2018) (quoting 12 C.F.R § 1024.31). A "[l]oss mitigation option" is defined as "an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower." *Id.* The Consumer Financial Protection Bureau's ("CFPB") official interpretation of Regulation X further clarifies whether a mere inquiry may properly be deemed an application, explaining:

> When an inquiry or prequalification request becomes an application. A servicer is encouraged to provide borrowers with information about loss mitigation programs. If in giving information to the borrower, the borrower expresses an interest in applying for a loss mitigation option and provides information the servicer would evaluate in connection with a loss mitigation application, the borrower's inquiry or prequalification request has become a loss mitigation application.

12 C.F.R. § 1024.41(b)(2), Supp. I.

Defendant argues that the February 9 Call between Defendant and Plaintiff constitutes an oral loss mitigation application. Defendant contends it both complied with Regulation X and triggered the duplicative request exception by timely acknowledging Plaintiff's oral loss mitigation

application and notifying Plaintiff that her application was incomplete. In support, Defendant points to its Affidavit, which provides that "Plaintiff submitted to the Defendant an oral loss mitigation application, including a telephonic financial interview used to evaluate eligibility for loss mitigation" on February 9, 2022. Defendant's Affidavit ¶ 13. Defendant also provided a screenshot of the customer service notes Defendant recorded during the February 9 Call. ECF No. [27-1] at 93. The February 9 Call notes provide in relevant part that Plaintiff expressed a desire to keep the property, that Defendant advised that a required advance minimum payment "is at least [four] monthly payments," that the parties "discussed [a payment] increase due to escrow shortage," and that Plaintiff "completed a fin[ancial] interview." *Id.* The Call notes also indicate that Defendant advised Plaintiff "to call us back next week" to schedule an appointment with another representative. *Id.*

Plaintiff responds by asserting that she did not submit an oral loss mitigation application during the February 9 Call, and that even if the Court disagrees, that the February 9 Call fails to trigger the duplicative request exception because the oral loss mitigation application remained incomplete. Plaintiff's Affidavit explains that Defendant's allegation that she "requested to engage in an oral loss application" is "incorrect," explaining that Plaintiff initiated the February 9 Call "in a good-faith effort to advise of my mother's passing and inquire about any next steps I may need to take related to the home." Plaintiff's Affidavit ¶ 28. Plaintiff also contends that "the customer representative" she spoke with "solicited me to apply for loss mitigation." *Id.*

Defendant replies by arguing Plaintiff's Affidavit—particularly Plaintiff's inquiry about "next steps"—meets the low threshold of constituting a loss mitigation application rather than a mere inquiry. Defendant argues that this admission, coupled with evidence that Plaintiff "participat[ed] in a financial interview following a loss mitigation solicitation meets the very broad

definition of loss mitigation application in Regulation X." Reply at 4. Defendant asserts that because the February 9 Call constitutes an oral loss mitigation application, and because Defendant complied with Regulation X with regard to this Loss Mitigation Application, Plaintiff's claims regarding her May 25, 2022 Loss Mitigation Application are barred by the duplicative request exception.

### ii.    The February 9 Call

To determine if the duplicative request exception applies to Plaintiff's RESPA claims, the Court must first determine whether the February 9 Call constitutes an oral loss mitigation application. As noted above, Regulation X broadly defines an oral loss mitigation application as "an oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation for a loss mitigation option." *Yeh Ho*, 739 Fed. App'x at 529 (quoting 12 C.F.R § 1024.31). The CFPB's official interpretation further explains that "[i]f in giving information to the borrower, the borrower expresses an interest in applying for a loss mitigation option and provides information the servicer would evaluate in connection with a loss mitigation application, the borrower's inquiry or prequalification request has become a loss mitigation application." 12 C.F.R. § 1024.41(b)(2), Supp. I. The official interpretation also notes that "[a] loss mitigation application is considered expansively and includes any 'prequalification' for a loss mitigation option." *Id.*

Determining whether a mere inquiry or prequalification request is properly deemed a loss mitigation application accordingly requires evaluating 1) whether the borrower "expresses an interest in applying for a loss mitigation option," and 2) whether the borrower provided "information the borrower would evaluate in connection with a loss mitigation application." *Id.* The CFPB provides examples that shed light on the distinction between a mere inquiry and a loss

mitigation application. *Compare* "if a borrower requests that a servicer determine if the borrower is 'prequalified' for a loss mitigation program by evaluating the borrower against preliminary criteria to determine eligibility for a loss mitigation option, the request constitutes a loss mitigation application" *with* "[if a] borrower calls to ask about loss mitigation options and servicer personnel explain the loss mitigation options available to the borrower and the criteria for determining the borrower's eligibility for any such loss mitigation option … [but] … [t]he borrower does not, however, provide any information that a servicer would consider for evaluating a loss mitigation application … only an inquiry has taken place and no loss mitigation application has been submitted[.]" *Id.*

Here, it is undisputed that the February 9 Call occurred, but the parties dispute whether the February 9 Call constitutes an oral loss mitigation application or a mere inquiry. Plaintiff's Affidavit ¶ 13; ECF No. [27-1] at 93; SAMF ¶ 10; RSAMF ¶ 10. Defendant's Motion argues that the February 9 Call constitutes an oral loss mitigation application and asserts that controlling case law shows that this application acts as a bar to all three of Plaintiff's RESPA claims. Plaintiff's responds that the February 9 Call does not constitute an oral loss mitigation application, arguing that calling to ask about "next steps" in relation to the Property constitutes a mere "inquiry."[6] Plaintiff explains that she called Defendant to "inquire about any next steps I may need to take related to the home[,]" and that during this call, Defendant "solicited me to apply for loss mitigation." Plaintiff's Affidavit ¶ 28. Defendant replies that Plaintiff's own characterization of

---

[6] The parties also dispute whether the duplicative request exception only applies to complete loss mitigation applications. Because the Court finds whether the February 9 Call constitutes a loss mitigation application is a genuine dispute of material fact, it declines to interpret the proper scope of the exception. *See* 12 C.F.R. § 1024.41(i) ("[a] servicer must comply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application.").

the February 9 Call, in addition to the call notes provided by Defendant, clearly demonstrate that the February 9 Call meets the CFPB's broad definition of a loss mitigation application.

As a threshold matter, Defendant is incorrect that federal case law resolves the present dispute. In each case cited by Defendant, the court either found that the plaintiff had previously completed a loss mitigation application, or the plaintiff conceded that they had done so.[7] Those authorities provide little guidance as to whether the February 9 Call may properly be deemed a loss mitigation application. In *Navia*, for example, the court simply noted that the defendant "asserted, and attached documents to support, that it had previously reviewed, approved, and entered into a loan modification" with the plaintiff. *Navia*, 708 F. App'x at 630 n.2. And as previously noted, *Navia* interpreted a prior version of Section 1024.41(i). Here, Plaintiff disputes whether the February 9 Call constitutes an oral loss mitigation application, and Defendant has not provided any authority that demonstrates that Plaintiff's conduct during this call meets the definition of an oral loss mitigation application.

Defendant argues that the undisputed facts that Plaintiff called to inquire about "next steps," coupled with the call notes indicating that Plaintiff completed a financial interview, satisfy the CFPB's expansive definition of a loss mitigation application. Plaintiff contends that she did not call Defendant on February 9, 2022 to inquire about her loss mitigation options or to determine if she was pre-qualified. Defendant disputes that characterization but fails to sufficiently rebut the notion that Plaintiff initiated the February 9 Call as a mere inquiry. The plain language of Section

---

[7] *See Brimm v. Wells Fargo Bank*, N.A., 688 F. App'x 329 (6th Cir. 2017) (plaintiff concedes Defendant responded to several prior loss mitigation applications); *Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan Tr. 2006-7*, 920 F.3d 269 (5th Cir. 2019) (assuming without discussion that there was a prior loss mitigation application); *Navia v. Nation Star Mortg. LLC*, 708 F. App'x 629 (11th Cir. 2018) (finding that plaintiff previously completed a prior loss mitigation application). Plaintiff also accurately points out that all three cases cited by Defendant interpret a prior, narrower version of Section 1024.41(i).

§ 1024.41(b)(2) requires demonstrating that Plaintiff "expresse[d] an interest in applying for a loss mitigation option." Although Defendant has shown that Plaintiff *could* have expressed an interest in applying for a loss mitigation option by inquiring about "next steps" on the February 9 Call, Defendant assumes that this inquiry, along with Plaintiff "participating in a financial interview following a loss mitigation solicitation meets the very broad definition of loss mitigation application in Regulation X." Reply at 4. But Defendant does not show that Plaintiff did express interest, nor does Defendant explain how soliciting what it deems a loss mitigation application from Plaintiff comports with the plain language of Section 1024.41(b)(2).[8] The contents of the February 9 Call are disputed, and a reasonable factfinder could reasonably conclude that Plaintiff's reference to "next steps" was simply an inquiry into the foreclosure or loss mitigation process, not an oral loss mitigation application.

The Court therefore concludes that there is a genuine dispute as to whether the February 9 Call constitutes an oral loss mitigation application. Defendant is accordingly not entitled to summary judgment based on the duplicative request exception, as its potential applicability depends on a genuine dispute of material fact.

The Court proceeds to analyze Plaintiff's Amended Complaint. Count I alleges that Defendant violated Section 1024.41(b)(2)(i)(B) by failing to provide written notice of receipt of Plaintiff's additional document submission within five business days. Count II alleges that Defendant violated Section 1024.41(c) by failing to provide written notice of receipt of Plaintiff's facially complete loss mitigation application within thirty days. Count III alleges that Defendant violated Section 1024.41(f)(2)'s limited foreclosure provision by initiating a foreclosure action

---

[8] Defendant is correct that the CFPB interprets Regulation X as reserving "the conduct of a servicer's evaluation with respect to any loss mitigation option … [to] the sole discretion of the servicer," 12 C.F.R. § 1024, Supp. I, cmt. 1024.41, ¶ 41(c)(1), but this general discretion does not permit Defendant to unilaterally convert a mere inquiry into a loss mitigation application.

against the Property despite receiving Plaintiff's loss mitigation application before doing so. Each Count will be discussed in turn.

### B. Count I: Notice under § 1024.41(b)(2)(i)(B)

In Count I, Plaintiff alleges that Defendant violated Regulation X's notice requirements under Section 1024.41(b)(2)(i)(B) by failing to timely acknowledge Plaintiff's June 8, 2022 submission of additional documents ("June 8 Submission"). In the Motion, Defendant argues that Section 1024.41(b)(2)(i)(B)'s notice requirements only apply to loss mitigation applications, not to submissions of additional documents. As such, Defendant contends that Section 1024.41(b)(2)(i)(B) is inapplicable to Plaintiff's June 8 Submission because it was simply a submission of additional documents, not a loss mitigation application. Defendant points out that it complied with Section 1024.41(b)(2)(i)(B) with respect to Plaintiff's March 25, 2022 loss mitigation application by sending Plaintiff letters on March 25 and 31, 2022, and that Count I of Plaintiff's Amended Complaint accordingly fails. Plaintiff responds that Defendant violated Section 1024.41(b)(2)(i)(B) with respect to Plaintiff's June 8 Submission by failing to promptly request additional documents or corrected information from Plaintiff. Defendant replies that Section 1024.41(b)(2)(i)(B) does not apply to submissions of additional documents, and that Plaintiff fails to point to controlling authority to the contrary.

Section 1024.41(b)(2)(i)(B) provides that loan servicers must:

> Notify the borrower in writing within 5 days … after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation is either complete or incomplete. If the servicer determines that the loss mitigation application is incomplete, this provision requires servicers to state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date ….

12 C.F.R § 1024.41(b)(2)(i)(B). Section 1024.41(b)(2)(i)(B) accordingly required Defendant to

notify Plaintiff in writing within five business days of receiving the loss mitigation application to (1) acknowledge receipt of the loss mitigation application; and (2) if the loss mitigation is incomplete, to notify the borrower and "state the additional documents and information the borrower must submit" to complete their application. *Id.*

### i.      Plaintiff's Loss Mitigation Application

Here, the undisputed evidence shows that Plaintiff submitted a loss mitigation application ("LMA") to Defendant on May 25, 2022. ECF No. [27-1] at 120-67. The evidence also shows that Defendant sent Plaintiff two letters on May 31, 2022. Defendant's first letter acknowledged receipt of Plaintiff's LMA. *Id.* at 170-72. Defendant's second letter informed Plaintiff that her LMA was incomplete and advised Plaintiff which additional documents Defendant needed to complete its review, and the deadline for submitting such documents. ECF No. [27-1] at 174-77.

Defendant accurately points out that the May 31, 2022 letters satisfy its obligations under Section 1024.41(b)(2)(i)(B) with respect to Plaintiff's LMA, and Plaintiff concedes that those letters "likely satisfied the requirements of § 1024.41(b)(2)(i)(B), albeit disjointly." The Court agrees and finds that Defendant did not violate Section 1024.41(b)(2)(i)(B) with respect to Plaintiff's LMA. That finding is not dispositive of Count I of Plaintiff's Amended Complaint, however, as the parties dispute whether Section 1024.41(b)(2)(i)(B) applies to Plaintiff's June 8 Submission.

### ii.      Plaintiff's June 8, 2022 Submission of Additional Documents

The parties also dispute whether Defendant violated Section 1024.41(b)(2)(i)(B) by failing to promptly inform Plaintiff that her June 8 Submission failed to complete the loss mitigation application. Defendant argues that it did not violate Section 1024.41(b)(2)(i)(B)'s notice requirements because Section 1024.41(b)(2)(i)(B) only applies to loss mitigation applications

themselves, not to submissions of additional documents. Defendant accordingly contends that because it complied with Section 1024.41(b)(2)(i)(B) with respect to Plaintiff's May 25, 2022 LMA, and because Plaintiff's June 8 Submission was a submission of additional documents rather than a loss mitigation itself, Section 1024.41(b)(2)(i)(B) does not apply. Defendant notes that the 6th Circuit recently held that Section 1024.41(b)(2)(i)(B) does not apply to submissions of additional documents and urges the Court to reach the same conclusion here. *See Hurst v. Caliber Home Loans, Inc.*, 44 F. 4th 418, 426-27 (6th Cir. 2022).

Plaintiff responds by arguing that the CFPB's official interpretation of Section 1024.41(b)(2)(i)(B) and related authority make clear that its notice requirements apply to Plaintiff's June 8 Submission. Plaintiff maintains that Defendant was obligated to promptly inform Plaintiff that corrected documents were needed to complete the loss mitigation application despite Plaintiff's June 8 Submission, and that Defendant's failure to do so violated Section 1024.41(b)(2)(i)(B). Defendant replies that Plaintiff fails to show that Section 1024.41(b)(2)(i)(B) applies to Plaintiff's June 8 Submission, and  Defendant is entitled to judgment as a matter of law.

Defendant relies on the plain language of Section 1024.41(b)(2)(i)(B) and the Sixth Circuit's decision in *Hurst* to argue that Section 1024.41(b)(2)(i)(B)'s notice provisions do not apply to Plaintiff's June 8 Submission. By its own terms, Section 1024.41(b)(2)(i)(B)'s notice requirements apply only to "loss mitigation applications." The text makes no reference to submissions of additional documents, or to additional notice obligations after a servicer has both acknowledged receipt and advised the borrower of the completeness or incompleteness of the application. Defendant accordingly urges the Court to follow *Hurst* and find that Section 1024.41(b)(2)(i)(B)'s notice requirements only apply to loss mitigation applications, not to submissions of additional documents.

Plaintiff points out the CFPB's official interpretation of Section 1024.41(b)(2)(i)(B), arguing that this official guidance demonstrates that Section 1024.41(b)(2)(i)(B) confers additional notice obligations for submissions of additional documents. This commentary provides:

> Later discovery of additional information required to evaluate application. Even if a servicer has informed a borrower that an application is complete (or notified the borrower of specific information necessary to complete an incomplete application), if the servicer determines, in the course of evaluating the loss mitigation application submitted by the borrower, that additional information or a corrected version of a previously submitted document is required, the servicer must promptly request the additional information or corrected document from the borrower pursuant to the reasonable diligence obligation in § 1024.41(b)(1) ....

12 C.F.R. § 1024. Supp. I, cmt. 41(b)(2)(i)(B).

The Eleventh Circuit has not addressed the issue before this Court. The Sixth Circuit in *Hurst* held that Section 1024.41(b)(2)(i)(B) applies only to loss mitigation applications themselves. The court discussed this official interpretation in the context of Section 1024.41(b)(1)'s reasonable diligence requirement, explaining that a "servicer fails to exercise reasonable diligence if it does not 'promptly request the additional information or a corrected version of a previously submitted document' after determining that such information is necessary." *Hurst*, 44 F. 4th 418, 425 (internal citations omitted). The court then analyzed the plaintiff's notice claim under Section 1024.41(b)(2)(i)(B), holding that "[t]he obligations of a servicer under 12 C.F.R. § 1024.41(b)(2)(i) only apply to the receipt of a 'loss mitigation application,' namely, initial loan modification application[s]." *Id.* at 427. The court explained that "Regulation X requirements do not extend to a borrower's subsequent submission of additional documents" and accordingly granted summary judgment on the plaintiff's Section § 1024.41(b)(2)(i)(B) notice claim. *Id.*

While not binding, the Court finds that *Hurst's* interpretation of Section § 1024.41(b)(2)(i)(B) is persuasive, and "there is more merit in having federal courts follow the

same course in cases of this kind in order to establish country-wide uniformity in the application of merely regulatory statutes and regulations." *Thomas v. Fla. Power & Light Co.*, 764 F.2d 768, 770-71 (11th Cir. 1985). Absent clear authority to the contrary, the Court declines to "unnecessarily conflict" with *Hurst* "on the application of regulatory laws such as the one at issue here." *Id.* As discussed above, the court analyzed Section § 1024.41(b)(2)(i)(B) and its official interpretation, holding that its notice requirements apply only to loss mitigation applications, not submissions of additional documents. *Hurst*, 44 F. 4th at 727. The Sixth Circuit was accordingly unpersuaded that the servicer violated Section § 1024.41(b)(2)(i)(B) by failing to adequately respond to the plaintiff's submissions of additional documents because Section § 1024.41(b)(2)(i)'s notice requirements "only apply to the receipt of a 'loss mitigation application.'" *Id.* at 427.

The Court aligns itself with the Sixth Circuit's analysis. The CFPB's official interpretation instructs loan servicers to exercise reasonable diligence in requesting additional or corrected documents if they are needed to complete a loss mitigation application, regardless of whether they initially complied with Section § 1024.41(b)(2)(i)(B)'s notice requirements. That official interpretation does not discuss *additional* document submissions and it does not suggest that Section § 1024.41(b)(2)(i)(B)'s *notice* requirements continue to apply after a servicer has complied with Section § 1024.41(b)(2)(i)(B) regarding a borrower's loss mitigation application.

The Court therefore follows the plain language of Section 1024.1(b)(2)(i)(B) and *Hurst* in finding that Section 1024.1(b)(2)(i)(B)'s notice requirements apply to loss mitigation applications, not submissions of additional documents. The undisputed evidence demonstrates that Defendant complied with Section 1024.1(b)(2)(i)(B) by promptly acknowledging receipt of Plaintiff's LMA, and by informing Plaintiff that additional documents were needed to complete her LMA. ECF No.

[27-1] at 170-77. Defendant is accordingly entitled to judgment as a matter of law with regard to Count I.

### C. Count II: Notice under Section 1024.41(c)

Defendant next argues that it is entitled to summary judgment on Count II of Plaintiff's Amended Complaint because Plaintiff failed to complete her LMA, absolving Defendant of its additional notice obligations under 12 C.F.R. § 1024.41(c). Plaintiff responds that her June 8, 2022 Submission rendered her LMA complete or facially complete, and Defendant accordingly violated Section 1024.41(c) by failing to timely provide written notice that her LMA was, at minimum, facially complete. Defendant replies that Plaintiff's June 8 Submission failed to facially complete her LMA, and that Section 1024.41(c) is accordingly inapplicable.

Section 1024.41(c) governs the "[e]valuation of loss mitigation applications." 12 C.F.R. § 1024.41(c). That provision imposes requirements on servicers upon receiving complete or incomplete loss mitigation applications. "A complete loss mitigation application means an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1). "[I]f a servicer receives a *complete* loss mitigation application more than 37 days before a foreclosure sale," then Section 1024.41(c)(1) requires servicers to 1) "[e]valuate the borrower for all loss mitigation options available to the borrower, and 2) "[p]rovide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage" within "30 days of receiving the loss mitigation application." *Id.* at § 1024.41(c)(1)(i)-(ii).

Section 1024.41(c)(2) focuses on a servicer's obligations with respect to incomplete or facially complete loss mitigation applications. That provision provides that "[a] loss mitigation

19

application shall be considered facially complete when a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section, when no additional information is requested in such notice, or once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) of this section."[9] *Id.* at § 1024.41(c)(2)(iv). That provision further provides that "[i]f the servicer later discovers that additional information or corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application." *Id.* If the "borrower completes the application within this period, the application shall be considered complete as of the date it first became facially complete...." *Id.*

At bottom, if a borrower submits a facially complete application, then Section 1024.41(c)(iv) prohibits a servicer from initiating a foreclosure action without first providing notice to the borrower. The parties dispute whether Plaintiff submitted a complete or facially complete application, and therefore whether Section 1024.41(c)'s notice requirements apply to Plaintiff's LMA.

Defendant argues that its May 31, 2022 Notice to Plaintiff discharged its notice obligations under Section 1024.41(c) because Defendant informed Plaintiff that her LMA was incomplete, and Plaintiff's June 8, 2022 Submission failed to render her LMA facially complete. Defendant contends that because Plaintiff's LMA remained incomplete, it had no obligation to notify Plaintiff of her loss mitigation options, if any, within 30 days of receiving Plaintiff's incomplete LMA.

---

[9] Section 1024.41(c)(3)(i)-(ii) requires servicers to provide written notice that a borrower's loss mitigation application is complete, and the loss mitigation options available to the borrower, so long as a complete or facially complete application was received "more than 37 days before a foreclosure sale ...." 12 C.F.R. § 1024.41(c)(3)(i)-(ii).

Defendant concludes that its July 5, 2022 letter informing Plaintiff that her LMA was incomplete and Defendant was consequently discontinuing its review further demonstrates that it complied with Section 1024.41(c).

Plaintiff responds that her June 8 Submission rendered her LMA facially complete because she submitted the missing documents requested by Defendant in its second May 31, 2022 letter ("May 31 Notice"). Plaintiff argues that, at minimum, Defendant violated Section 1024.41(c) by failing to provide an opportunity for Plaintiff to cure the deficiencies in her facially complete LMA. Plaintiff contends that her June 8 Submission contained the same documents that were contained in her LMA, and that she only made this submission—and provided a Letter of Explanation to the same effect—out of an abundance of caution.

Defendant replies that Plaintiff's LMA remained incomplete because it contained "illegible bank statements" and other "incomplete or poorly scanned" documents. Reply at 2-3. Defendant asserts that Plaintiff's June 8 Submission failed to render her LMA facially complete because Plaintiff re-submitted the same documents, Defendant did not request all of the documents provided by Plaintiff, and there are discrepancies between Plaintiff's income information as reflected in her LMA, June 8 Submission, and Plaintiff's Affidavit.

Defendant's argument that Plaintiff's June 8 Submission did not render Plaintiff's LMA facially complete is unavailing. Defendant has identified issues with Plaintiff's documents submitted with her LMA and June 8 Submission, but those deficiencies do not absolve Defendant of its obligation to refrain from initiating a foreclosure action against Plaintiff without first providing notice upon receiving a facially complete application. The record demonstrates that Defendant's May 31 Notice informed Plaintiff that her LMA was incomplete, and Plaintiff subsequently complied with Defendant's May 31 Notice by submitting the documents requested.

ECF No. [27-1] at 179-89; Defendant's Affidavit ¶ 21.

Defendant's May 31 Notice requested that Plaintiff:

> Please provide the income documentation based on the income type you selected on the Mortgage Assistance Application. Documentation must be within the past 90 days and should provide the amount and the pay frequency of Income. (Additional information is needed regarding bank statement(s) that were provided to us. Please contact our Customer Care Center.)

ECF No. [27-1] at 174-77.

The record reflects that the documents Plaintiff submitted in her June 8 Submission matched the general income documentation selected on Plaintiff's LMA, the documents were within the past 90 days, and the documents provided the amount and pay frequency of her income. ECF No. [27-1] at 179-89.[10] While Defendant observes that Plaintiff's Affidavit "reflects significant other amounts and sources of income" compared to Plaintiff's LMA and June 8 Submission, Defendant's argument misses the mark. First, Defendant carries the burden to demonstrate that it is entitled to judgment as a matter of law based on the undisputed facts. Defendant cannot do so by retroactively pointing to discrepancies between Plaintiff's LMA and her affidavit to show that Plaintiff's LMA remained facially incomplete. The proper inquiry is determining whether Plaintiff's June 8 Submission constitutes a facially complete loss mitigation application under Regulation X.

Section 1024.41(c)(2)(iv) states that a loss mitigation application "shall be considered facially complete when a borrower submits all the missing documents and information stated in the notice required under paragraph (b)(2)(i)(B)." 12 C.F.R. § 1024.41(c)(2)(iv). The parties do not dispute that Defendant's May 31 Notice required Plaintiff to submit the income documentation

---

[10] The parties dispute whether Plaintiff provided the same documents in her June 8 Submission that were provided with her LMA, and the sufficiency of this documentation. SMF ¶ 17; SAMF ¶ 17.

described in Plaintiff's LMA, that this income documentation must be "within the past 90 days" and "should provide the amount and pay frequency of Income." ECF No. [27-1] at 174-77. Defendant has failed to show that Plaintiff's June 8 Submission did not comply. Plaintiff provided the income documentation described in her LMA, the documentation was within 90 days, and it contained the amount and frequency of Plaintiff's income. ECF No. [27-1] at 179-89. In short, Plaintiff provided the general documentation requested in Defendant's May 31 Notice.

Defendant's argument that income discrepancies rendered Plaintiff's LMA incomplete lacks support from the plain language of Section 1024.41(c). It is difficult to determine how Plaintiff could have known her LMA remained incomplete based on Defendant's general guidance in its May 31 Notice. Defendant did not advise Plaintiff that her LMA remained incomplete and cannot now argue that Plaintiff's LMA was not facially complete due to issues Defendant failed to disclose. If Defendant determined that "additional information or corrections to a previously submitted document are required to complete the application," then Section 1024.41(c) required Defendant to "promptly request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs(f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application." 12 C.F.R. § 1024.41(c)(2)(iv). Defendant was accordingly required to refrain from initiating a foreclosure action against Plaintiff until she "was given a reasonable opportunity to complete the application." *Id.* Defendant did not do so, instead initiating a foreclosure action against Plaintiff on June 23, 2022, before it notified Plaintiff that her LMA remained incomplete on July 5, 2022. SAMF ¶ 28; RSAMF ¶ 28.

Defendant has accordingly failed to demonstrate that the undisputed evidence entitles it to judgment as a matter of law on Plaintiff's Section 1024.41(c) claim. The Court finds that whether Plaintiff's LMA was rendered facially complete is a genuine dispute of material fact, and

Defendant is accordingly not entitled to judgment as a matter of law with respect to Count II.

**D.  Count III: Section 1024.41(f)(2)'s Foreclosure Prohibition**

Count III of Plaintiff's Amended Complaint alleges that Defendant violated Section 12 C.F.R. § 1024.41(f)(2)'s limited foreclosure prohibition by initiating a foreclosure action on June 23, 2022, despite Plaintiff allegedly having completed a loss mitigation option. ECF No. [11] ¶ 58. Defendant argues that Section 1024(f)(2) is inapplicable because (1) Plaintiff's LMA is a duplicative request; (2) Plaintiff never completed its LMA, therefore the foreclosure prohibition is inapplicable; and (3) an exception to the limited foreclosure prohibition applies under Section 1024(f)(2)(iii). Plaintiff responds that Section 1024.41(f)(2)'s limited foreclosure prohibition applies because (1) the duplicative request exception is inapplicable; (2) Plaintiff's LMA was at least facially complete, thereby triggering Section 1024.41(f)(2); and (3) Section 1024(f)(2)(iii) is inapplicable because Plaintiff did not fail to perform under a prior loss mitigation option.

 Section 1024.41(f)(2) provides that "[i]f a borrower submits a complete loss mitigation application" during the foreclosure review process or before a servicer has "made the first notice or filing" required for any foreclosure process, the servicer is temporarily prohibited from filing for foreclosure. 12 C.F.R. § 1024.41(f)(2). Section 1024.41(f)(2)'s limited foreclosure prohibition does not apply, however, if (1) "[t]he servicer has sent the borrower a notice … that the borrower is not eligible for any loss mitigation option" and provides additional information on appeal procedures; (2) "[t]he borrower rejects all loss mitigation options"; or (3) "[t]he borrower fails to perform under an agreement on a loss mitigation option." *Id.* at § 1024.41(f)(2)(i)-(iii). Defendant argues that it did not violate Section 1024.41(f)(2)'s limited prohibition on foreclosure for two independent reasons: (1) Plaintiff never completed a prior loss mitigation application, or (2) Plaintiff failed to perform under a prior loss mitigation option, thereby triggering the exception to Section 1024.41(f)(2)'s foreclosure prohibition under Section 1024.41(f)(2)(iii).

> **i.      Whether Section 1024.41(f)(2) is inapplicable because of a prior or incomplete loss mitigation application.**

Defendant contends that Section 1024.41(f)(2)'s foreclosure prohibition does not apply because Plaintiff failed to submit a complete loss mitigation application on or after the February 9 Call, and that this failure acts as a bar to Plaintiff's Section 1024(f)(2) claim with respect to its LMA. The Court has already determined that whether the February 9 Call constitutes an oral loss mitigation option is a genuine dispute of material fact. *See* Section IV.A.

Defendant also argues that Section 1024.41(f)(2)'s foreclosure prohibition is inapplicable because Plaintiff never rendered her LMA complete or facially complete. That argument fails, as the Court has also already determined that whether Plaintiff's June 8 Submission rendered her LMA facially complete is a genuine dispute of material fact.

The Court accordingly determines that Section 1024.41(f)(2)'s limited foreclosure prohibition is not barred by a prior loss mitigation application, or by Plaintiff's failure to render her LMA facially complete.

> **ii.     Whether Section 1024.41(f)(2) is inapplicable because Plaintiff failed to perform under a prior loss mitigation option**

Defendant also argues that Section 1024.41(f)(2)'s foreclosure prohibition does not apply because Plaintiff failed to perform under a prior loss mitigation option. Defendant argues that Plaintiff's predecessor-in-interest's—her mother, Janie Marshall—modification of the property's Note and Mortgage by a March 1, 2016 Loan Modification ("2016 Loan Modification") was a prior loss mitigation option.[11] Noting that Plaintiff defaulted on the 2016 Loan Modification on October 1, 2021, Defendant argues that Plaintiff's default constitutes a failure to perform under a

---

[11] The Court finds—and Plaintiff does not dispute—that the 2016 Loan Modification constitutes a loss mitigation application. *See* 12 C.F.R. § 1024.31 ("Loss mitigation option means an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower.")

prior loss mitigation option, and that Section 1024.41(f)(2)(iii)'s exception to the foreclosure prohibition accordingly applies to the present dispute.[12] *Id.*

Plaintiff responds that Section 1024.41(f)(2)(iii) is inapplicable for several reasons: (1) Defendant ignores the fact that Plaintiff's predecessor-in-interest, not Plaintiff herself, entered into the prior loss mitigation option; (2) the exceptions to Section 1024.41(f)(2)'s foreclosure prohibition should not apply because Ocwen Loan Servicing, not Defendant, agreed to the 2016 Loan Modification; (3) the exceptions to Section 1024.41(f)(2) should not apply because approximately five years have elapsed between the 2016 Loan Modification and the October 2021 default; (4) Defendant's authority in support of its position are distinguishable; and (5) Defendant's "hyper technical" interpretation of Section 1024.41(f)(2) runs counter to the purpose of RESPA. Defendant replies by arguing that both the plain language of Section 1024.41(f)(2) and persuasive authority support its position, and that Plaintiff fails to point to any authority indicating that Section 1024.41(f)(2) is inapplicable where the loan servicer or borrower have transferred their interest, or because five years elapsed between the loan modification and loss mitigation application.

The plain language of Section 1024.41(f)(2)(iii) prohibits servicers from making "the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless … [t]he borrower fails to perform under an agreement on a loss mitigation option." 12 C.F.R. § 1024.41(f)(2)(iii). That provision contains no language restricting its application to the borrower who entered into the loss mitigation option, nor does it indicate that the exception only applies to the original loan servicer. The provision does not include a temporal element. Plaintiff

---

[12] Plaintiff disputes the admissibility of Defendant's Affidavit to prove that the 2016 Loan Modification entered a state of default. SAMF ¶ 8. Plaintiff does not dispute that the 2016 Loan Modification entered default on October 1, 2021, however. *Id.* The Court finds that Defendant's Affidavit is admissible for this fact, as it is hearsay that can be "reduced to admissible form" at trial, namely, through properly authenticated business records. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Defendant's Affidavit ¶ 3.

discusses Congress and the CFPB's general intent in enacting RESPA and promulgating Regulation X at some length, but Plaintiff fails to identify legal authority supporting its interpretation. Instead, Plaintiff unsuccessfully argues that the authorities cited by Defendant are distinguishable from the present dispute.

Defendant cites the decisions of numerous district courts as persuasive authority for its argument that Section 1024.41(f)(2)(iii) applies to the present dispute. Each case involves a borrower who was barred from enforcing Regulation X's provisions prohibiting foreclosure based on the borrower's failure to perform under a prior loss mitigation option.

In *Malcolm v. Seterus*, No. 5:18-CV-01937, 2020 WL 1434496 at *4 (N.D. Ohio Mar. 24, 2020), the court found that the plaintiff was precluded from enforcing Section 1024.41(f)(2)'s limited foreclosure provision under Section 1024.41(f)(2)(iii) due to its failure to perform under a prior loss mitigation option. In *Son v. Wells Fargo Bank, N.A.*, No. 1:18-CV-488-RP, 2019 WL 317251 at * 3 (W.D. Tex. Jan. 24, 2019), the court similarly found that Section 1024.41(g)(3) precluded the plaintiff from enforcing Section 1024.41(g)'s limited foreclosure prohibition due to the plaintiff's failure to perform under a prior loss mitigation option. *See also Edge-Wilson v. Wells Fargo Bank, N.A.*, No. 18-CV-03302-PJH, 2018 WL 6438359 at *2 (N.D. Cal. Dec. 7, 2018) (holding that Section 1024.41(g)(3) bars a plaintiff from enforcing Section 1024.41(g)'s limited foreclosure provision if the plaintiff failed to perform under a prior loss mitigation option); *Cuellar v. Selene Fin. LP*, No. 417CV00729ALMCAN, 2018 WL 4572707 at *5 (E.D. Tex. Aug. 31, 2018), *report and recommendation adopted*, No. 4:17-CV-729, 2018 WL 4566680 (E.D. Tex. Sept. 24, 2018) (Section 1024.41(g)(3) precluded the plaintiff from enforcing Section 1024.41(g)'s limited foreclosure prohibition even though the loss mitigation option was offered by a prior servicer).

Plaintiff responds by conceding that those cases support the principle that a borrower who fails to perform under a prior loss mitigation option is precluded from enforcing § 1024.41(f)(2) or its sister regulation § 1024.41(g). Plaintiff nevertheless maintains that each case is distinguishable. Plaintiff argues that each case is distinguishable because, unlike here, either the underlying borrower, loan servicer, or both remained the same throughout the loss mitigation process.

Plaintiff is correct that Defendant has not identified controlling authority that resolves the present dispute. The Court is nonetheless persuaded that those cases, taken together, support Defendant's argument that the plain language of Section 1024.41(f)(2)(iii) bars Plaintiff's Section 1024.41(f)(2) claim.

In *Malcolm*, 2020 WL 1434496 at *4, the Court found that Section 1024.41(f)(2)(iii) applied to bar the plaintiff's Section 1024.41(f)(2) claim on a subsequent loss mitigation application. The Court rejected the plaintiff's argument that Section 1024.41(f)(2)(iii) only applies to the loss mitigation application at issue, finding that Section 1024.41(f)(2)(iii) applies even if the borrower defaulted on a prior loss mitigation option. *Id.* The Court found additional support for its position in a line of cases where courts interpreting the identical language in Section 1024.41(g)(3) "have held that this exception applies when the borrower previously failed to perform under an agreement on a loss mitigation option regardless of whether the borrower had subsequently submitted a more recent loss mitigation application." *Id.* (collecting cases). Plaintiff attempts to distinguish *Malcolm* by noting that, unlike here, the loan servicer remained unchanged, but fails to point to authority suggesting that a change in loan servicers renders Section 1024.41(f)(2)(iii) inoperable.

The remaining cases cited by Defendant support its interpretation of Section

1024.41(f)(2)(iii) as a bar to Plaintiff's Section 1024.41(f)(2) claim. In *Son v. Wells Fargo Bank, N.A.*, 2019 WL 317251 at * 3, the court similarly found that the plaintiff's May 2017 loan modification absolved the defendant loan servicer from its obligations under Section 1024.41(g). Plaintiff distinguishes that case by noting that months, not years, passed between the loan modification and the plaintiff's subsequent default, and because the servicer and borrower always remained the same. As noted, the court in *Edge-Wilson*, 2018 WL 6438359 at *2, held that the plain language of Section 1024.41(g) permits loan servicers to "initiate foreclosure proceedings if '[t]he borrower fails to perform under an agreement on a loss mitigation option.'" Plaintiff argues that this holding is distinguishable because "the underlying parties and the underlying loss mitigation options are different and distinct entities." Response at 20.

The Court agrees that *Son* and *Edge-Wilson* are not perfectly analogous to the instant case, yet Plaintiff points to no authority that indicates Section 1024.41(f)(2)(iii) is or should be so temporally limited, nor does Plaintiff identify authority that supports the proposition that the loan servicer and borrower must remain the same for Section 1024.41(f)(2)(iii) to apply. Defendant, on the other hand, cites *Cuellar v. Selene Fin. LP*, for support that Section 1024.41(f)(2)(iii) applies even if the loss modification option was executed by a prior servicer. As discussed, the court in *Cuellar* held that the plaintiff was precluded from seeking relief under Section 1024.41(f)(2)'s sister provision, Section 1024.41(g)(3), due to plaintiff's failure to perform under a 2015 loan modification. 2018 WL 4572707 at *5. The court found that Section 1024.41(g)(3)(iii) applied to bar Plaintiff's claim even though a prior servicer provided the loan modification and subsequently transferred its interest to the servicer at issue. *Id*

Plaintiff also argues that Defendant's interpretation of Section 1024.41(f)(2)(iii) runs counter to the CFPB's intent for Section 1024.41(f)(2), but the authorities it provides in support

are unpersuasive. Most notably, Plaintiff cites to the CFPB's Official Staff Commentary regarding Regulation X's duplicative request provision, Section 1024.41(i), which provides:

> Servicing transfers. Section 1024.41(i) provides that a servicer need not comply with section 1024.41 for a subsequent loss mitigation application from a borrower where certain conditions are met. A transferee servicer and a transferor servicer, however, are not the same servicer. Accordingly, a transferee servicer is required to comply with the applicable requirements of section 1024.41 upon receipt of a loss mitigation application from a borrower whose servicing the transferee servicer has obtained through a servicing transfer, even if the borrower previously received an evaluation of a complete loss mitigation application from the transferor servicer.

Consumer Financial Protection Bureau's Official Staff Commentary on Regulation X, 2014 WL 2195779, at *13 (June 2018).

The Staff Commentary fails to support Plaintiff's argument for two reasons. First, by its own terms, the Staff Commentary applies to Section 1024.41(i), not Section 1024.41(f)(2). Second, although this Staff Commentary explains that transferee servicers must comply with the "applicable requirements" of Section 1024.41, it discusses the servicers obligations with respect to loss mitigation applications upon receipt of a new loss mitigation application, not instances where a borrower fails to perform under a prior loss mitigation option.

Plaintiff's appeals to the stated purpose of RESPA is also misplaced. While the Court agrees that "… RESPA is to be 'construed liberally in order to best service Congress' intent," *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010), Plaintiff's general appeals to RESPA and Regulation X's intent fail to demonstrate that Section 1024.41(f)(2)(iii) should not apply to Plaintiff's Section 1024.41(f)(2) claim.

The Court accordingly finds that Section 1024.41(f)(2)(iii)'s exception to Section 1024.41(f)(2)'s limited foreclosure prohibition applies even if the servicer invoking Section 1024(f)(2)(iii) is not the original loan servicer. The Court also finds that Section 1024(f)(2)(iii) is

not limited only to loss mitigation options executed within several months or a year of the subsequent loss mitigation application. The Court declines to impose a temporal limitation into the plain text of Section 1024(f)(2)(iii).

The remaining interpretive question is whether Section 1024.41(f)(2)(iii) applies to Plaintiff as a successor-in-interest to the original borrower who executed the loss mitigation option. The Court finds that it does. This Court has already determined that Plaintiff is a "confirmed successor in interest" for Regulation X purposes. *See* Order on Motion to Dismiss, ECF No. [21] at 9-13. The plain language of Section 1024.41(f)(2) is silent as to whether borrowers and successor-in-interest borrowers are treated as identical for Section 1024.41(f)(2)(iii) purposes, and Plaintiff's appeal to the CFPB's Official Staff Commentary on Section 1024.41(i) is unconvincing. The Court adheres to the plain language of Section 1024.41(f)(2)(iii) and its prior ruling that Plaintiff is a successor in interest for Regulation X purposes. *See Ga. State Conference of the NAACP v. City of LaGrange, Ga.*, 940 F.3d 627, 631 (11th Cir. 2019) "[W]here the language of the statute is unambiguous, we need look no further and our inquiry ends." (quoting *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999)).

The Court finds that Section 1024.41(f)(2)(iii) applies to bar Plaintiff's Section 1024.41(f)(2) claim because Section 1024.41(f)(2)(iii) applies to Plaintiff as a successor-in-interest borrower, and to Defendant as the subsequent loan servicer claiming the exception. Defendant is accordingly entitled to summary judgment on Count III of Plaintiff's Amended Complaint.

### E.  Damages

Defendant argues that it is entitled to summary judgment because Plaintiff has failed to demonstrate that she is entitled to either statutory or actual damages for Defendant's alleged RESPA violations. The Court first addresses whether the undisputed evidence establishes that Plaintiff is not entitled to statutory damages, as the issue of statutory damages was previously

discussed in the Court's Order on Defendant's Motion to Dismiss, ECF No. [21].

### i. Statutory Damages

Defendant argues that the record evidence fails to demonstrate that Defendant has a pattern and practice of non-compliance with Regulation X and RESPA. As this Court previously noted, Plaintiff sufficiently demonstrated that Defendant may have a pattern or practice of violating RESPA as evidenced by six prior CFPB complaints regarding Defendant's debt-collection practices. *See* ECF No. [11] ¶ 33. While it is true that "there is no magic number of violations that create a 'pattern or practice of noncompliance,' courts have held that two violations of RESPA are insufficient, but allegations of five RESPA violations have been deemed adequate." *Branch Banking & Tr. Co.*, 237 F. Supp. 3d 1326, 1335 (S.D. Fla. 2017) (citing *Renfroe v. Nationstar Mortg.*, LLC, 822 F.3d 1241, 1247 (11th Cir. 2016)). Defendant argues that Plaintiff's citation to six CFPB consumer complaints in her Amended Complaint is insufficient to overcome summary judgment, but aside from observing that Defendant is a large servicer that services hundreds of thousands of loans, provides no evidence to rebut those consumer complaints. Defendant's Affidavit ¶ 26.

The authorities Defendant provides in support also fail to support finding that Plaintiff has failed to meet its burden as the non-movant. In *Bennett v. Nationstar Mortg., LLC*, No. CV 15-00165-KD-C, 2015 WL 5294321, 2015 WL 5294321 at * 12 (S.D. Ala. Sept. 8, 2015), the court held that the plaintiff's "bare assertion that there are 'over 20 *complaints* against Nationstar' in the CFPB database" insufficiently plead entitlement to statutory damages absent further "information as to the author, date, details, merit, or resolution of these supposed complaints."[13] Here, Plaintiff

---

[13] Defendant also cites *Brooks v. Scheib*, 813 F.2d 1191, 1193-95 (11th Cir.1987), a police brutality case, for its observation that "the number of complaints bears no relation to their validity[,]" but fails to explain how this applies, let alone how this language supports finding that Plaintiff's evidence is insufficient.

described six formal CFPB complaints regarding Defendant's loan servicing practices in its Amended Complaint. ECF No. [11] ¶ 33. Unlike the plaintiff in *Bennett*, Plaintiff's Amended Complaint provides the complaint number and a basic description of each complaint indicating that each details Defendant's prior RESPA violations. These complaints are accessible from the CFPB's public website and provide details as to Defendant's RESPA practices.[14]

Defendant asserts that these complaints are inadmissible but fails to explain why these complaints cannot be reduced to an admissible form at trial. The Court concludes those complaints are adequate in the absence of any authority suggesting that six CFPB complaints are insufficient to demonstrate a pattern and practice of non-compliance with RESPA. Whether Defendant has a pattern and practice of noncompliance with RESPA is a genuine dispute of material fact, as Defendant has failed to point to any evidence or authority demonstrating that it is entitled to judgment on the issue of statutory damages as a matter of law. Plaintiff also sufficiently demonstrated that she suffered concrete harm because—as Defendant accurately points out— RESPA's private right of action allows for recovery if Plaintiff can demonstrate "actual damages" or a "pattern or practice" of a servicer's non-compliance. 12 U.S.C. § 2605(f). Defendant is accordingly not entitled to summary judgment on these issues.

### ii.    Actual Damages

Defendant also argues that it is entitled to summary judgment because Plaintiff has failed to demonstrate actual damages. Defendant argues that Plaintiff fails to sufficiently show entitlement to damages for (1) attorney's fees and costs; (2) emotional distress or non-pecuniary damages; and (3) damages flowing from the foreclosure action itself. Plaintiff responds that her Amended Complaint and supporting Affidavit demonstrate her entitlement to damages for

---

[14]    Consumer   Financial   Protection   Bureau,   Consumer   Complaint   Database, https://www.consumerfinance.gov/data-research/consumer-complaints.

attorneys' fees and costs as well as emotional distress damages resulting from Defendant's alleged RESPA violations.

Whether Plaintiff is entitled to actual damages is a genuine dispute of material fact. Plaintiff established that she retained attorneys and incurred related costs after Defendant initiated the Foreclosure Action against Plaintiff. Plaintiff's Affidavit ¶ 26. Defendant replies that Plaintiff "did not present any evidence that would allow this Court to ascertain when those fees and costs were incurred or whether they actually increased or decreased" because of Defendant's alleged RESPA violations. Reply at 8. Yet Plaintiff's Affidavit provides that she has "paid a total of $4,810 in costs for separately retaining [attorneys] to defend me in the Foreclosure Action." Plaintiff's Affidavit ¶ 26. Defendant's conclusory assertion that Plaintiff's Affidavit is insufficient fails to demonstrate that there is no genuine dispute of material fact as to whether Plaintiff is entitled to actual damages for her attorney's fees.

The Court is similarly unconvinced by Defendant's argument that Plaintiff's Affidavit is insufficient for Plaintiff to meet her burden of actual damages legally and proximately caused by RESPA. This assertion also insufficiently demonstrates that Defendant is entitled to judgment as a matter of law in light of Plaintiff's Affidavit detailing emotional distress stemming from Defendant's alleged RESPA violations. Plaintiff's Affidavit ¶¶ 18, 20, 22-24. Those damages can be proven at trial, as a "plaintiff may establish causation through lay testimony on their emotional distress damages under RESPA."[15] *McLean v. GMAC Mortg. Corp.,* 595 F. Supp.2d 1360, 1370 (S.D. Fla. 2009). Whether Plaintiff is entitled to emotional distress damages is therefore also a genuine dispute of material fact.

---

[15] Defendant is incorrect that this Court previously found that those emotional distress damages are insufficient under RESPA. *See Russell v. Nationstar Mortg., LLC,* No. 1461977, 2015 WL 5819663 at * 8 n.7 (S.D. Fla. Oct. 6, 2015) (finding that the plaintiff was not entitled to statutory or actual damages because plaintiff failed to show that the defendant violated RESPA).

Finally, Defendant's argument that Plaintiff failed to sufficiently show that her damages flow from Defendant's alleged RESPA violations—rather than the underlying Foreclosure Action itself—is also unavailing. "For actual damages to be 'a result of' a servicer's noncompliance, the 'plaintiff must present evidence to establish a causal link between the [servicer's] noncompliance and [her] damages.'" *Baez v. Specialized Loan Servicing, LLC*, 709 F. App'x 979, 982 (11th Cir. 2017) (citing *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1027-28 (11th Cir. 2001) (*en banc*)). Plaintiff has established that Defendant may have violated RESPA with regard to her LMA. The Court finds that whether Plaintiff has suffered actual damages as a result of Defendant's noncompliance is a genuine dispute of material fact.

The undisputed evidence demonstrates that Defendant did not notify Plaintiff that her LMA remained incomplete despite her June 8 Submission until July 5, 2022, after Defendant initiated foreclosure proceedings against Plaintiff. Defendant's Affidavit ¶ 23; SAMF ¶ 19; ECF No. [27-1] at 191-93. Defendant has failed to demonstrate that it complied with RESPA before initiating foreclosure proceedings against Plaintiff. Plaintiff's Affidavit establishes that she suffered emotional distress damages and incurred attorney's fees as a result of this foreclosure. Plaintiff's Affidavit ¶¶ 18, 20-24, 26. Defendant argues that Plaintiff fails to demonstrate entitlement to actual damages because neither the emotional distress nor attorneys' fees detailed in Plaintiff's Affidavit was caused by Defendant's potential noncompliance with RESPA. However, Plaintiff's Affidavit specifically attributes "Defendant's premature filing of the Foreclosure Action" as causing Plaintiff "great emotional stress that continues to impact [her] mental wellbeing." *Id.* ¶ 18. The extent to which Plaintiff's emotional distress was caused by Defendant's potential noncompliance with RESPA can be determined by Plaintiff's lay testimony at trial.

Plaintiff's Affidavit also makes clear that she has paid "a total of $4,810 in costs for separately

retaining" attorneys to defend against "the Foreclosure Action." *Id.* ¶ 26. Defendant argues that this showing is insufficient because Plaintiff cannot show that foreclosure would have been avoided had Defendant complied with RESPA. Defendant's argument fails, as Plaintiff has demonstrated that the undisputed evidence shows that Defendant may have failed to comply with RESPA by violating Regulation X's notice and foreclosure prohibition provisions, and that she suffered damages as a result. Plaintiff need not show that foreclosure would have been avoided to meet her burden as the non-movant.

The Court accordingly finds that whether Defendant's potential noncompliance with RESPA caused Plaintiff to suffer actual damages, and the extent to which these damages may be properly attributed to Defendant's noncompliance with RESPA, is a genuine dispute of material fact.

## V. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment, **ECF No. [27]**, is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's claim under Count II shall proceed against Defendant.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 11, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record